Yer Xɪᴏɴɢ and Bia Vicky Xiong, minors, by John Edmondson, their Guardian ad Litem, Tong Xiong, Xee Xiong, and Xai Xiong, individually, Plaintiffs-Appellants,

v.

Nhia Lue Xɪᴏɴɢ, a/k/a Vang Lue Xiong, individually, and State Farm Insurance Company, Defendants-Respondents.

Court of Appeals

*No. 01–0844. Submitted on briefs April 8, 2002.—Decided April 23, 2002.*

2002 WI App 110

(Also reported in 648 N.W.2d 900.)

On behalf of the plaintiffs-appellants, the cause was submitted on the briefs of *Frances Li* and *Thao & Li, P.A.*, of Minneapolis, Minnesota.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Jane L. Kirkeide* and *Menn, Teetaert & Beisenstein, Ltd.*, of Appleton.

Before Cane, C.J., Hoover, P.J., and Peterson, J.

¶ 1. HOOVER, P.J. Yer Xiong and Bia Vicky Xiong, minors, by their guardian ad litem, and Tong Xiong, Xee Xiong and Xai Xiong (the Xiongs) appeal a judgment dismissing their wrongful death claim following the death of their mother, Mai Xiong, in a car accident. The trial court determined that under WIS. STAT. § 895.04, the wrongful death claim belonged to their father, Nhia Lue Xiong, a/k/a Vang Lue Xiong.

¶ 2. Mai was a passenger in a car driven by Nhia, the Xiongs' father. The Xiongs argue that the trial court erroneously dismissed their claim on the ground that Nhia, as the surviving spouse, was first in the line of priorities with regard to the ownership of a wrongful death claim under WIS. STAT. § 895.04. The Xiongs contend that because their parents' marriage was invalid,

695

Mai had no surviving spouse and therefore their wrongful death claim should be reinstated.

¶ 3. The Xiongs contend that their parents' marriage, performed according to traditional Hmong ceremonial rites in Laos in 1975, was not valid.[1] They argue that because their parents were not married in the eyes of Wisconsin law, the wrongful death claim belongs to them. We conclude that under the unique circumstances of the case, including Mai's and Nhia's prior residence in a common-law marriage state, Mai's status is one of spouse under WIS. STAT. § 895.04. Therefore, we affirm the judgment of dismissal.

## BACKGROUND

¶ 4. Nhia and Mai are Hmong, an indigenous ethnic minority that in the mid-twentieth century resided in the mountain regions of Southeast Asia, primarily northern Laos. *See* Chou Ly, *The Conflict Between Law and Culture: The Case of the Hmong in America,* 2001 WIS. L. REV. 471, 473. Prior to their migration to Southeast Asia, the Hmong are believed to have resided in China as far back as five thousand years. *Id.* at 473 n.20. Hmong society was organized around extended families and large clans to which one owed great allegiance. *Id.* at 474. "For the most part, the Hmong were able to remain independent from the controlling Laotian government . . . ." *Id.* The Hmong are recognized as having their own unique cultural identity, language and customs. Although they existed within the geo-political boundaries of Laos, they had their own unique traditions. *See id.*

---

[1] In a March 19, 2002, order, the supreme court denied certification of this issue.

¶ 5. This matter was submitted to the court on affidavits and deposition transcripts. Nhia, the father in this action, is a machine operator at the Menasha Corporation. He was born in Laos and was a "one star" soldier from 1968 to 1975 in a secret guerilla army of Hmong soldiers that operated under the auspices of the United States Central Intelligence Agency. With the help of a translator, Nhia testified at his deposition that his role as a soldier was to gather intelligence for the CIA.

¶ 6. At the end of March or in April 1975, Nhia and Mai participated in a traditional Hmong marriage ceremony in Laos. Nhia received permission from Mai's parents to marry their daughter. As part of the ceremony, there were two witnesses, who functioned as negotiators. They negotiated Nhia's payment to Mai's family in accordance with Hmong marriage tradition. Nhia testified he made the payment to Mai's family. There is no dispute that the couple fully complied with Hmong traditional marriage rites.

¶ 7. Nhia testified that it was common for Hmong people to marry in this manner without a formal document from the Royal Laotian government. Although he knew the government required that papers be filed to validate the marriage in Laos, Nhia testified that, as a member of the secret army that worked for the CIA, he would have been killed if he had gone to the government and told them who he was. This statement is unrebutted. Nhia and Mai fled Laos in May 1975 due to the collapse of the Royal Laotian regime and the communist takeover. They had no documentation of any kind, such as birth certificates, driver's licenses or military identification.

¶ 8. Nhia explained that when they reached the refugee camp in Thailand, no papers were required

697

because "they know exactly all the Hmong people are refugee[s] and they will not have any information." Mai and Nhia lived in the refugee camp for the next five years. One child was born to them while they were living in the camp, and no birth certificate was filled out. Nhia testified that he did not have their marriage validated while at the camp. The record is not clear what procedures were in place in Thailand to validate the marriage[2] and under what country's laws the marriage would have been validated.

¶ 9. In 1980, when Nhia and Mai came to the United States, they told immigration authorities that they were married. Mai's application for citizenship and certificate of naturalization states that she was married. Nhia testified that after the Hmong traditional marriage ceremony, he and Mai both believed they were married.

¶ 10. Nhia and Mai lived in Chicago for three months before leaving for Pennsylvania, a state that recognizes common-law marriage. There, Nhia was employed by a mushroom producer and Mai bore three children. After living approximately three years in Pennsylvania as husband and wife, the couple moved to Wisconsin, where Mai gave birth to their fifth child.[3] For the next fifteen years, they continued to live together as husband and wife and raise their five children in Wisconsin. Both became United States citizens in

---

[2] It is undisputed that the laws of Thailand ordinarily would not apply to refugees living in the camps.

[3] At the time of Nhia's deposition, he testified that his children were ages twenty-one, twenty, nineteen, eighteen and sixteen.

698

1995. There is no suggestion that the validity of their marriage was ever questioned until the events that gave rise to this action.

¶ 11. On August 23, 1998, Nhia was driving east on U.S. Hwy. 10 and collided with the rear of a van that was pulling a trailer. Mai, who was sitting in the front seat, suffered fatal injuries as a result of the collision. Mai's death certificate recites that she was married.[4]

¶ 12. The Xiongs commenced this wrongful death action against Nhia and his insurer, State Farm, to recover damages arising from the death of their mother. State Farm defended on the ground that Nhia is Mai's surviving spouse and therefore under WIS. STAT. § 895.04, their children, the Xiongs, have no right to assert a wrongful death claim. State Farm contended that whether Nhia and Mai were married was a question of law to be decided by the trial court. Upon briefs and affidavits, the trial court agreed with State Farm and dismissed the Xiongs' claim. The trial court ruled that the couple "were married and their marriage is valid and entitled to recognition by the State of Wisconsin and all its Courts as reflected by the record in this case." The Xiongs appeal the judgment of dismissal.

## DISCUSSION

¶ 13. The Xiongs do not dispute that under WIS. STAT. § 895.04, the children of a surviving spouse have no claim for the wrongful death of their parent. A wrongful death claim did not exist at common-law and is purely statutory. *Cogger v. Trudell*, 35 Wis. 2d 350, 353, 151 N.W.2d 146 (1967). Under the statute, "[s]ur-

---

[4] The death certificate lists her surviving spouse's name as Vang Lue Xiong; Nhia explained that this was his previous name.

viving children had no cause of action as long as the surviving spouse of decedent remained alive." *Id.* at 355. The statute provides that the surviving spouse was the first in the line of priorities with regard to the ownership of a wrongful death claim. *Id.*

¶ 14. The Xiongs argue, nonetheless, that because their parents never legally married, Nhia is not a surviving spouse and they are entitled to bring the wrongful death action.[5] Generally, whether a marriage is valid is controlled by the law of the place where the marriage was contracted. *See In re Estate of Ferguson*, 25 Wis. 2d 75, 130 N.W.2d 300 (1964). "The law of the matrimonial domicil governs with respect to the substantial rights of husband and wife, as between themselves and their privies . . . ." *Jaeger v. Jaeger*, 262 Wis. 14, 16, 53 N.W.2d 740 (1952) (citation omitted). "Marriages valid where celebrated are valid everywhere, except those contrary to the law of nature and those which the law has declared invalid upon the ground of public policy." *In re Estate of Campbell*, 260 Wis. 625, 631, 51 N.W.2d 709 (1952). The Xiongs assert that their parents' Hmong marriage ceremony was not valid under Laotian law.

¶ 15. In support of their contention, the Xiongs offer an affidavit of a Laotian legal expert, Khamben Sanavongsay, who stated that under "existing Laotian Marriage Law in 1975, a marriage is not valid unless it

[5] Although a "wrongful death action is not an action to affirm or annul a marriage," the right of a party in a wrongful death action to assert that a survivor is not the spouse of a decedent has been upheld. *Corning v. Carriers Ins. Co.*, 88 Wis. 2d 17, 21, 276 N.W.2d 310 (Ct. App. 1979).

is solemnized by the District Officer, Taseng."[6] Laos also had common-law marriage. If the Taseng was not present at the ceremony, the parties and six witnesses, three for each side, had to file necessary documents with the Taseng, who would verify the information and certify it to the county officer, the Chao Mouang. The six witnesses had to certify under oath that the parties had lived together continuously in the country for a long period of time or that they had children together in Laos. The signature of a Chao Mouang was necessary proof to establish marital status. According to the affidavit, "[t]his procedure was uniformed nationally as Lao Royal Government followed the French Federal system."

¶ 16. The affidavit also points out that although Nhia and Mai lived together in a refugee camp in Thailand for five years, they were not considered residents of Thailand and could not claim any right under the law of that country.[7] Additionally, the Xiongs observe that common-law marriages were abolished in

---

[6] A Laotian native, Sanavongsay attended the Royal Institute of Law and Public Administration in Vientiane, Laos, from 1964 to 1967, when he graduated and was licensed as an attorney at law. He completed his studies of Laotian law as inherited from the French at the International Institute of Public Administration in Paris, France. In 1969, he was appointed deputy governor of Saravane Province, Laos, and implemented the civil codes, including marriage and divorce laws, and provided legal assistance to county officers, called "Chao Mouang." In 1974, he was appointed governor of Champasak Province and was responsible for the appointment, oversight and training of the Chao Mouang and their subordinate district officers, called Taseng, until the communist government came to power in 1975.

[7] It is undisputed that Nhia and Mai were not married according to Thai law.

Wisconsin in 1917. *See In re Van Schaick's Estate*, 256 Wis. 214, 216, 40 N.W.2d (1949). They conclude that because their parents' marriage was not validated under the laws of Laos, Thailand or Wisconsin, Mai was not Nhia's spouse under Wisconsin law.

¶ 17. We are not persuaded. Although the Xiongs offer a tidy syllogism to support their claim, we are mindful that this is not a case where a foreign government has decreed the marriage invalid and we are asked to uphold the foreign judgment. Consequently, to override the presumption of legitimacy of Nhia and Mai's marriage may require a recognition that the laws of the former Royal Laotian regime supercede the solemnization ceremonies of a discrete and unique cultural tradition contained in its own boundaries, implying potential federal executive branch questions.[8]

¶ 18. State Farm offers no counter affidavit to refute the Xiongs' assertions regarding the requisites of Laotian law. Nonetheless, State Farm contends that a presumption of validity must be accorded the ceremonial rites: "Of course, where there has been a marriage ceremony, it is prima facie valid, for the law presumes in favor of marriage." *Williams v. Williams*, 63 Wis. 58, 64, 23 N.W. 110 (1885). Also, State Farm argues that the official acts of the medical examiner and the immigration officials must be accorded a presumption of validity. "[I]n reviewing the actual facts existing at the time a certificate of death was filed, a circuit court must accord the information certified by a medical examiner

---

[8] In a different context, one author asserts: "The tradition of recognizing tribal marriage law is quite pronounced." Antoinette Sedillo Lopez, *Evolving Indigenous Law: Navajo Marriage-Cultural Traditions & Modern Challenges*, 17 ARIZ. J. INT'L & COMP. L. 283, 304 (2000).

a presumption of validity." *In re Sullivan*, 218 Wis. 2d 458, 467–68, 578 N.W.2d 596 (1998). The party petitioning the court "bears the burden of showing by the greater weight of the credible evidence that the facts contained in the certificate of death do not represent the actual facts in effect at the time the certificate of death was filed." *Id.* at 468.

¶ 19. State Farm maintains that a mere affidavit, prepared over twenty-five years after the fact, is insufficient to rebut the strong presumptions as to the validity of the ceremonial marriage, the lawful nature of the relationship that followed it, and the regularity of the immigration and naturalization documentation and death certificate.

> The considerations which support . . . the presumption of regularity of official and other lawful acts—coupled with general public policy to preserve and protect marriage and the home—give rise to a presumption that a marriage which is shown to have been solemnized was legally and properly performed, that the parties had legal capacity, and that the marriage is valid. . . . In short, every reasonable presumption is indulged in favor of the validity of the marriage . . . .

*In re Estate of Campbell*, 260 Wis. at 630 (quoting 1 JONES ON EVIDENCE § 86, at 150 (4th ed. 1938)).[9]

¶ 20. State Farm points out that there is no question that the couple believed they were validly married under the Hmong ceremonial rites.[10] It also claims that

---

[9] "When a marriage is shown in evidence, whether regular or irregular, and whatever the form of proof, the law raises a strong presumption of its legality." *Holland Am. Ins. Co. v. Rogers*, 313 F. Supp. 314, 317 (N.D. Calif. 1970).

[10] Nhia has stated, however, that he now believes the marriage is not recognized under Wisconsin law.

"[i]t is in the public interest to maintain a marriage relationship." *Smith v. Smith*, 52 Wis. 2d 262, 269, 190 N.W.2d 174 (1971); *see also* Wis. Stat. § 765.01. So strong are the presumptions and public policy concerns, argues State Farm, that a court has equitable powers to rule an otherwise invalid marriage valid, relying on *Halker v. Halker*, 92 Wis. 2d 645, 651, 285 N.W.2d 745 (1979) (Equitable considerations apply and second marriage may be validated under common-law even though statutory requirements have not been met.).

¶ 21. While we conclude that Mai's relationship to Nhia is one of a lawful spouse, we do not rely on a presumption. Due to factual distinctions, we are unconvinced that the *Halker* case squares with State Farm's theory. Closer to the facts at hand, however, is *Leong v. Leong*, 27 F.2d 582 (9th Cir. 1928), which recognizes a "putative marriage." The parties, who were Chinese, were married in Hawaii in 1884 "all in accordance with Chinese customs, but without a license, as required by the laws of Hawaii." *Id.* They immediately assumed and maintained, for the next thirty-five years, the relations of husband and wife. *Id.* The wife bore thirteen children and performed the domestic duties of a housewife. *Id.* In 1920, the husband ceased to recognize the marriage as valid because no license had been obtained as required by Hawaiian law. *Id.* The Ninth Circuit Court of Appeals, recognizing the contractual nature of marriage, observed that "equity protects relationships and vindicates rights not recognized in a court of law . . . ." *Id.* at 585. The court held that the "putative wife" was entitled to the rights of a legal wife. *Id.*

·¶ 22. Accordingly, we are satisfied that there is authority for the proposition that when a determination is made that a marriage is void or voidable and the

court finds that either or both parties believed in good faith that the marriage was valid, the court shall declare that the marriage shall have the legal effect of a valid marriage. *See* Christopher L. Blakesley, *The Putative Marriage Doctrine*, 60 TUL. L. REV. 1, 2 (1985), and cases cited therein. A putative marriage "is a marriage which has been solemnized in proper form and celebrated in good faith by one or both parties, but which, by reason of some legal infirmity, is either void or voidable." *Id.* at 6. We agree with the circuit court's ruling that Mai's and Nhia's marital relationship should be accorded recognition under Wisconsin law.

¶ 23. Recognizing their marital relationship under the circumstances presented here does not violate any public policy. This is not a case where evidence of the marriage rites would offend this state's notions of justice and decency. The parties were of age and competent to enter into the marital contract. Also, WIS. STAT. § 895.04 does not define the term "spouse," thereby not foreclosing the notion that a "putative spouse" could fall within the meaning of the statute.

¶ 24. Although not briefed by the parties, we note that the couple resided as husband and wife for three years in Pennsylvania, one of the few states that recognize common-law marriage. In Pennsylvania, a "common law marriage contract does not require any specific form of words, all that is essential is proof of an agreement to enter into the legal relationship of marriage at the present time." *Faber v. TGI-Friday's, Inc.*, 148 F. Supp. 2d 556, 558–59 (E.D. Penn. 2001). Cohabitation and reputation of marriage are factors to be considered in determining whether the parties have entered into a common-law marriage. *Id.* at 559. Because the parties fled Laos shortly after their ceremony, had only refugee status in Thailand and lived just three

months in Illinois before settling in Pennsylvania for the next three years, where three of their children were born, Nhia and Mai's connection, as a married couple, to Laos and Thailand was more tenuous than to Pennsylvania. Accordingly, their residence in Pennsylvania, their first real home as a married couple, is another reason to recognize their marital relationship.

## CONCLUSION

¶ 25. Marriage is the "foundation of the family and of society," the stability of which "is basic to morality and civilization, and of vital interest to society and the state." WIS. STAT. § 765.01(2). The Xiongs' arguments imply the potential for instability that a declaration of invalidity may have. Under the circumstances of this case, we are satisfied that Mai should be recognized as Nhia's lawful spouse. Therefore, we conclude that the trial court properly dismissed the Xiongs' wrongful death claim.

*By the Court.*—Judgment affirmed.