IN RE the MARRIAGE OF: Seng XIONG,
Petitioner-Respondent,

v.

Lang C. VANG, Respondent-Appellant.

Court of Appeals

*No. 2016AP1281. Submitted on briefs September 13, 2017.
—Decided October 24, 2017.*

2017 WI App 73

(Also reported in 904 N.W.2d 814.)

On behalf of the respondent-appellant, the cause was submitted on the brief of *Aaron W. Schenk* of *Schenk Law Firm, LLC*, Green Bay.

On behalf of the petitioner-respondent, the cause was submitted on the brief of *Joseph M. Recka* of *Recka & Associates*, Green Bay.

Before Stark, P.J., Hruz and Seidl, JJ.

¶ 1. STARK, P.J. Lang Vang appeals from a divorce judgment terminating his marriage to Seng Xiong. Vang argues the circuit court erred by granting a judgment of divorce because he and Xiong were never validly married. Vang alternatively argues that, even if the parties' marriage was valid, the circuit court erroneously exercised its discretion with respect to property division and maintenance.

¶ 2. We conclude that, under the facts of this case, the circuit court properly determined the parties had a legally recognizable putative marriage, pursuant to our prior decision in *Xiong ex rel. Edmondson v. Xiong*, 2002 WI App 110, 255 Wis. 2d 693, 648 N.W.2d 900. We further conclude the court properly exercised its discretion in dividing the parties' property and awarding maintenance to Xiong for an indefinite duration. We therefore affirm.

## BACKGROUND

¶ 3. Xiong petitioned for divorce from Vang in May 2014. Her petition alleged the parties were married in September 1980 at Ban Vinai, a refugee camp in Thailand.[1] Vang subsequently moved to dismiss Xiong's divorce petition, contending the parties were never legally married.

---

[1] Both Xiong and Vang are Hmong. We have previously explained that the Hmong are

an indigenous ethnic minority that in the mid-twentieth century resided in the mountain regions of Southeast Asia, primarily

¶ 4. On January 23 and July 6, 2015, the circuit court held evidentiary hearings regarding the validity of the parties' marriage. During the hearings, Xiong testified that she and Vang were married on September 24, 1980, in a wedding ceremony performed by her uncle. She testified a separate "strings ceremony" was performed three days after the wedding.[2] Xiong explained she did not want to marry Vang, but she was pressured or "forced" to do so by her family.[3]

¶ 5. A number of photographs were introduced into evidence during the July 6, 2015 hearing. Xiong testified one of those photographs—Exhibit 6—was taken in October 1980 and showed her and Vang

---

northern Laos. *See* Chou Ly, *The Conflict Between Law and Culture: The Case of the Hmong in America,* 2001 Wis. L. Rev. 471, 473. Prior to their migration to Southeast Asia, the Hmong are believed to have resided in China as far back as five thousand years. *Id.* at 473 n.20. Hmong society was organized around extended families and large clans to which one owed great allegiance. *Id.* at 474. "For the most part, the Hmong were able to remain independent from the controlling Laotian government . . . ." *Id.* The Hmong are recognized as having their own unique cultural identity, language and customs. Although they existed within the geo-political boundaries of Laos, they had their own unique traditions. *See id.*

*Xiong ex rel. Edmondson v. Xiong,* 2002 WI App 110, ¶ 4, 255 Wis. 2d 693, 648 N.W.2d 900.

[2] Xiong was apparently referring to a "baci" ceremony, which is "a ceremony to celebrate a special event, whether a marriage, a homecoming, a welcome, a birth, or [an] annual festival." *See* Lao Heritage Foundation, The Baci Ceremony, http://www. laoheritagefoundation.org/ceremonies/baci.jsp (last visited Sept. 27, 2017). The ceremony involves, among other things, tying strings around a person's wrist. *See id.* One of Vang's expert witnesses explained that the Hmong "borrow[ed]" the baci ceremony from Laotian culture after becoming involved in the Vietnam War.

[3] According to Xiong's divorce petition, Xiong was seventeen at the time of the marriage, and Vang was eighteen.

wearing Hmong wedding clothing. Xiong testified Exhibits 7, 8, 37, 38, and 39 were photographs of the "strings ceremony" that took place three days after the wedding. Handwriting on the back of Exhibits 37, 38, and 39 indicated these photographs were taken on September 27, 1980, and depicted "Lang and Seng's wedding." Xiong identified this handwriting as Vang's. Xiong also testified that two other photographs, marked as Exhibit 40, showed her wearing wedding clothes four days after the marriage ceremony, when she and Vang went to visit her family.

¶ 6. Xiong testified she and Vang came to the United States together in 1983. Over the next five years, they had four children together. Xiong cared for the parties' children so that Vang could go to engineering school. Xiong testified she learned in 2005 that Vang had a "girlfriend," and she and Vang stopped living together in December 2008. When asked why she waited until 2014 to file for divorce, Xiong responded, "Because at the time my kids [were] in school, in college, and I don't want this . . . to affect them. And then I—at the same time I was . . . having hope against hope that he still love us, his kids and me during that time."

¶ 7. Several of Xiong's family members corroborated her testimony that she and Vang were married in Thailand in September 1980. Xiong's uncle, Ga Cheng Xiong, testified he was the leader of the Xiong clan in the Ban Vinai refugee camp at that time and was involved in "marriage negotiations" leading up to Xiong and Vang's wedding. Ga Cheng Xiong confirmed that Xiong initially refused to marry Vang, and after two days of unsuccessful negotiations Vang approached Ga Cheng Xiong asking for help. Ga Cheng Xiong conceded that Xiong was ultimately coerced or

643

"indirect[ly] forc[ed]" to marry Vang. He testified Vang paid four silver bars "for the dowry" and fifteen silver coins "for the fees." Ga Cheng Xiong subsequently performed a marriage ceremony between Xiong and Vang, in accordance with all Hmong marriage rituals, during which Vang agreed to be Xiong's husband. Ga Cheng Xiong confirmed that a separate "string ceremony" was performed three days later.

¶ 8. Ga Cheng Xiong's wife, Bao Vang, testified Vang and his relatives "came to [her] house and beg[ged] or ask[ed] [her] husband to go with them and to plea with [Xiong] so that maybe [Xiong] . . . would marry [Vang]." Bao Vang testified she cooked food for the subsequent wedding ceremony, which was performed by her husband. She heard her husband declare Vang and Xiong to be husband and wife during the ceremony.

¶ 9. Xiong's older brother, Nao Tou Xiong, testified he first met Vang when Vang approached Xiong's family seeking to marry her. Nao Tou Xiong testified the subsequent marriage negotiations lasted three days, and Xiong was ultimately forced to marry Vang. Nao Tou Xiong confirmed that Vang paid a bride price in order to marry Xiong, and a wedding ceremony was subsequently performed according to Hmong marriage traditions.

¶ 10. Nao Tou Xiong clarified that the Hmong do not have marriage certificates, and marriages are instead "recorded" in the oral tradition. He denied that "cohabitation ceremonies" are a part of traditional Hmong culture and testified there is "no acceptance for cohabitation in Hmong life, Hmong society." He further explained that sex outside of marriage is "not appro-

priate in the Hmong culture" and is viewed as disrespecting or dishonoring "the family, . . . the girl, and . . . the culture."

¶ 11. In addition to the testimony summarized above, Xiong introduced several documents at the evidentiary hearings that referred to Vang as her husband. For instance, Xiong introduced her United States immigration file, which included multiple documents listing Vang as her "husband" or "spouse." Xiong testified Vang filled out several of these documents. Xiong also introduced a quit claim deed, dated November 28, 2012, by which "LANG C. VANG and SENG XIONG, husband and wife," transferred property to two of their children.

¶ 12. Vang denied during his testimony at the evidentiary hearings that he and Xiong were ever married. He testified he and Xiong met in 1980, were "friend[s]," and went on a few dates. According to Vang, the Hmong elders in the Ban Vinai refugee camp felt that Vang and Xiong's relationship was "mak[ing] them lose face," so they forced Vang and Xiong to live together. Vang testified he did not want to live with Xiong, and she did not want to live with him. He further testified he never intended to become married to Xiong, and, to the best of his knowledge, she did not intend to become married to him.

¶ 13. Vang conceded a ceremony took place in September 1980 involving "dinners and food," but he testified it was merely a "cohabitation" ceremony, rather than a wedding. Vang denied that any "string ceremony" was performed. He further testified he never filed for a marriage license in Thailand, Laos, or the United States.

¶ 14. Vang acknowledged that he and Xiong ultimately immigrated to the United States together and

lived together until 2005. However, he asserted that, after "liv[ing] together for that long with misery life," they mutually decided to separate. Vang testified he subsequently married his current wife, Patty Vang. He contended he never gave Xiong any reason to believe she was his legal wife because they "never married legally" and "never registered in any register office from Thailand or from the United States." Although Vang acknowledged he and Xiong had filed joint income tax returns "as husband and wife," he asserted they had "no choice" but to do so "because there's no . . . statement in the filing instructions saying that if I don't have a legal marriage, I cannot file."

¶ 15. Vang also relied on the testimony of two expert witnesses in support of his position that he and Xiong were never legally married. First, Suwatchai Samakkasetkorn, a family law attorney who had practiced in Thailand since 2007, testified Vang and Xiong were considered illegal immigrants under Thai law while they resided in the Ban Vinai refugee camp.[4] Samakkasetkorn testified that, under Thai law, illegal immigrants are not permitted to "obtain and have a recognized marriage in the nation of Thailand." Samakkasetkorn further testified that, for a marriage to

---

[4] Xiong objected to Samakkasetkorn's testimony, arguing it was inadmissible under the *Daubert* standard set forth in WIS. STAT. § 907.02 (2015–16). *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). The circuit court reserved ruling on Xiong's objection and permitted Samakkasetkorn to testify. It appears the court never made a formal ruling on Xiong's objection. However, the court discussed Samakkasetkorn's testimony during its oral ruling on Vang's motion to dismiss and referred to him as an "expert." This suggests the court implicitly overruled Xiong's objection.

All references to the Wisconsin Statutes are to the 2015–16 version unless otherwise noted.

be considered valid under Thai law, both parties "have to go to register the marriage at the register office."

¶ 16. Vang also presented the testimony of Yang Thai Vang, a Ph.D. student at the University of Wisconsin-Madison studying cultural anthropology, with a focus on Hmong language and culture.[5] Yang Thai Vang testified he has participated in or witnessed hundreds of Hmong marriages. Contrary to Xiong's testimony, he opined that the photograph marked as Exhibit 6 did not depict traditional Hmong wedding clothing because, unlike the clothes shown in that photograph, Hmong wedding clothes must be "brand new." He further opined that Exhibits 6 and 40 did not depict a wedding consistent with Hmong marriage traditions because the marriage negotiators were not included in those photographs. Yang Thai Vang also testified that the Hmong do not recognize forced marriages.

¶ 17. After considering the evidence presented by the parties, the circuit court concluded it was "not completely clear . . . whether Thailand would or would not recognize" Vang and Xiong's marriage. Stated differently, the court concluded the testimony was "ambiguous, at best" as to whether Vang and Xiong were validly married under Thai law. The court therefore proceeded to consider whether the parties' relationship qualified as a putative marriage under *Xiong*. In that case, we explained that a putative marriage is "a marriage which has been solemnized in proper form and celebrated in good faith by one or both parties, but which, by reason of some legal infirmity, is either void or voidable." *See Xiong*, 255 Wis. 2d 693, ¶ 22 (quoting

---

[5] Despite their shared surname, Yang Thai Vang confirmed that he is not closely related to Vang.

647

Christopher L. Blakesley, *The Putative Marriage Doctrine,* 60 TUL. L. REV. 1, 6 (1985)).

¶ 18. In applying this standard, the circuit court found that the "most credible evidence in this case tells me that there was a ceremony," and that ceremony "involved wedding clothing." The court rejected Yang Thai Vang's opinion that the clothes shown in Exhibit 6 were not wedding clothes, instead finding that, "for these particular individuals, the clothing that they were [wearing] in those photographs [was] culturally significant for them." The court further found there was "a celebrant of this ceremony," and "a marriage occurred that was appropriate to" Hmong culture.

¶ 19. The circuit court next found that, although it was undisputed Xiong did not want to marry Vang, "the most credible testimony" presented to the court indicated that Vang "did want to enter into this relationship and wanted it to be a wedding." The court found that both Vang and Xiong understood the September 24, 1980 ceremony was a marriage ceremony, and they "didn't understand that this was simply going to be a friendship." While the court acknowledged Vang's testimony that neither he nor Xiong believed they were married, it explained:

> I'm satisfied that the most credible testimony that was offered here to me today . . . [was] that both of these parties believed they were married and they were venturing forth together on this life of matrimony; and as verification or what helped strengthen my conviction of that is all of these documents that were submitted to me, particularly the documents in [Xiong's immigration file], which were largely prepared by [Vang], indicating that the two of them were married. He was representing that they were. His testimony was that once he got to the United States, he really

648

was unsure as to what they should do, and that's why the—the documents showed up with the two of them as married.

I, frankly, don't find that testimony to be credible whatsoever. I find that . . . testimony to be incredible, in that the reality is when the parties arrived here in this country, they arrived representing that they were married, they behaved as if they were married, they behaved as if they were married because they believed it. They signed real estate deeds. They signed tax returns.

I'm satisfied that they behaved in every respect like a married couple did because they believed they were married.

¶ 20. Based on these findings, the circuit court concluded the parties had a putative marriage that should be accorded recognition under Wisconsin law. The court therefore denied Vang's motion to dismiss Xiong's divorce petition.

¶ 21. The circuit court ultimately entered a judgment of divorce on June 6, 2016. As relevant to this appeal, the court equally divided the parties' divisible property. The court treated as divisible property a home that Vang purchased in 2008, following his purported marriage to Patty Vang, and awarded that home to Vang. In order to offset that award, the court assigned to Vang approximately $44,000 in student loan debt, which Xiong had incurred during the parties' marriage by cosigning a student loan for one of their children. The court also ordered Vang to pay Xiong $2,708.33 per month in maintenance for an indefinite duration. Vang now appeals.

## DISCUSSION

### I. Validity of the parties' marriage

¶ 22. Vang argues the circuit court erred by determining he and Xiong had a legally recognizable marriage. In reviewing the circuit court's ruling on this issue, we will not set aside the court's factual findings unless they are clearly erroneous. *See* WIS. STAT. § 805.17(2). A finding of fact is clearly erroneous when it is against the great weight and clear preponderance of the evidence. *Phelps v. Physicians Ins. Co.*, 2009 WI 74, ¶ 39, 319 Wis. 2d 1, 768 N.W.2d 615. Whether the facts fulfill the legal requirements for a valid marriage is a question of law that we review independently. *See Kierstyn v. Racine Unified Sch. Dist.*, 228 Wis. 2d 81, 88, 596 N.W.2d 417 (1999) (stating the application of facts to a legal standard is a question of law).

¶ 23. As a general matter, "whether a marriage is valid is controlled by the law of the place where the marriage is contracted." *Xiong*, 255 Wis. 2d 693, ¶ 14. "Marriages valid where celebrated are valid everywhere, except those contrary to the law of nature and those which the law has declared invalid upon the ground of public policy." *Id.* (quoting *Campbell v. Blumberg*, 260 Wis. 625, 631, 51 N.W.2d 709 (1952)).

¶ 24. It is undisputed that the purported marriage ceremony between Vang and Xiong was performed at a refugee camp in Thailand. Vang submitted evidence in the circuit court indicating that he and Xiong could not legally marry under Thai law because they were considered illegal immigrants. Vang argues on appeal that, because the marriage was not valid in

650

Thailand, where it was celebrated, it is also invalid in Wisconsin. Vang asserts this conclusion disposes of all other issues in this case.

¶ 25. In response, Xiong concedes the Hmong were "designated illegal aliens in Thailand" and therefore were "not permitted to marry under Thai law." However, Xiong argues Thai law is "irrelevant as to the validity of this marriage" because, even though the marriage was performed in a refugee camp in Thailand, she and Vang "remained domiciliaries of Laos." Xiong therefore argues that "Hmong rules of marriage, as accepted in Laos, their country of domicile[,] were in force." Xiong notes that Vang's own expert, Yang Thai Vang, testified the Hmong "[brought] their legal system" to the Bin Vinai refugee camp, including the ability of clan leaders to perform marriages.

¶ 26. There are two main problems with Xiong's argument. First, as noted above, Wisconsin law states that the validity of a marriage is controlled "by the law of the place where the marriage *was contracted.*" *Id.* (emphasis added). Here, the purported marriage was contracted in Thailand. Even accepting Xiong's claim that she and Vang were "domiciliaries of Laos"[6] at that time, Xiong cites no legal authority in support of the proposition that the law of the parties' country of domicile should determine the validity of their marriage, rather than the law of the country where the marriage occurred. Second, although Xiong asserts that Hmong "rules of marriage" are "accepted in Laos," she cites no legal authority in support of that proposi-

---

[6] The term "domiciliary" is defined as "[s]omeone who resides in a particular place with the intention of making it a principal place of abode; one who is domiciled in a particular jurisdiction." *Domiciliary,* BLACK's LAW DICTIONARY (10th ed. 2014).

tion. There is nothing in the record that would permit us to determine whether the marriage at issue here would be considered valid under Laotian law.

¶ 27. Due to these deficiencies in Xiong's argument, we decline to hold that Vang and Xiong were legally married because their marriage was valid under the laws of Laos, their country of domicile. We instead conclude that, based on the facts found by the circuit court, their relationship should be accorded legal recognition as a putative marriage.

¶ 28. The putative marriage doctrine was first recognized in Wisconsin in *Xiong*. That case involved a wrongful death lawsuit brought by the children of Mai Xiong against their father, Nhia Lue Xiong, after Mai was killed while a passenger in a vehicle driven by Nhia. *Xiong*, 255 Wis. 2d 693, ¶¶ 1–2. The circuit court dismissed the children's claim on the grounds that, under Wisconsin's wrongful death statute, any wrongful death claim stemming from Mai's death belonged to Nhia, as her surviving spouse. *Id.*, ¶ 2. The children, however, contended Nhia did not qualify as a surviving spouse because his marriage to Mai was invalid. *Id.*

¶ 29. It was undisputed that Nhia and Mai had "participated in a traditional Hmong marriage ceremony in Laos." *Id.*, ¶ 6. Nhia testified he and Mai both believed they were married following that ceremony. *Id.*, ¶ 9. However, they did not file any papers in Laos validating their marriage. *Id.*, ¶ 7. They subsequently fled to Thailand, where they remained in a refugee camp for five years, and they did not attempt to validate their marriage in any way during that time. *Id.*, ¶ 8. Nonetheless, when they later immigrated to the United States, they represented to immigration authorities that they were married. *Id.*, ¶ 9.

¶ 30. Nhia and Mai's children cited evidence indicating that their parents' marriage was not valid under Laotian law, and Nhia presented no evidence to dispute that proposition. *Id.*, ¶¶ 15, 18. Nonetheless, we concluded Nhia and Mai's relationship "should be accorded recognition under Wisconsin law" as a "putative marriage," that is, "a marriage which has been solemnized in proper form and celebrated in good faith by one or both parties, but which, by reason of some legal infirmity, is either void or voidable." *Id.*, ¶ 22 (quoting Blakesley, *supra,* at 6). We relied on *Leong v. Leong*, 27 F.2d 582 (9th Cir. 1928), in support of this conclusion, observing:

> The parties [in *Leong*], who were Chinese, were married in Hawaii in 1884 "all in accordance with Chinese customs, but without a license, as required by the laws of Hawaii." *Id.* They immediately assumed and maintained, for the next thirty-five years, the relations of husband and wife. *Id.* The wife bore thirteen children and performed the domestic duties of a housewife. *Id.* In 1920, the husband ceased to recognize the marriage as valid because no license had been obtained as required by Hawaiian law. *Id.* The Ninth Circuit Court of Appeals, recognizing the contractual nature of marriage, observed that "equity protects relationships and vindicates rights not recognized in a court of law . . . ." *Id.* at 585. The court held that the "putative wife" was entitled to the rights of a legal wife. *Id.*

*Xiong*, 255 Wis. 2d 693, ¶ 21.

¶ 31. We agree with the circuit court that, under the circumstances of this case, Vang and Xiong's relationship qualifies as a putative marriage and, as such,

should be accorded recognition under Wisconsin law.[7] The first requirement of a putative marriage is that it was "solemnized in proper form." *Id.*, ¶ 22 (quoting Blakesley, *supra*, at 6). The circuit court found that Vang and Xiong took part in a marriage ceremony, which was conducted in accordance with traditional Hmong marriage rituals. These findings are not clearly erroneous. Xiong and three of her relatives testified the September 24, 1980 ceremony was a marriage ceremony. In addition, both Xiong's uncle—the clan leader who performed the ceremony—and Xiong's older brother confirmed that the ceremony was performed in accordance with Hmong marriage traditions.

¶ 32. Vang asserts the September 1980 ceremony was "merely a 'cohabitation ceremony,' something significantly short of a wedding." However, Xiong's older brother expressly testified that there is no such thing as a cohabitation ceremony in traditional Hmong culture and that Hmong culture does not tolerate cohabitation or sex outside of marriage. Vang presented no

---

[7] Xiong asserts in her appellate brief that, rather than concluding the parties had a putative marriage, the circuit court should have simply determined they had a legally valid "cultural marriage" because their wedding ceremony was performed in accordance with "[t]he Hmong cultural tradition." We reject this argument for two reasons. First, Xiong cites no authority supporting the proposition that Wisconsin recognizes "cultural marriages" as legally valid. Second, Xiong's argument is inconsistent with our holding in *Xiong*. In that case, it was undisputed the parties took part in a marriage ceremony that "fully complied with Hmong traditional marriage rites." *Xiong*, 255 Wis. 2d 693, ¶ 6. However, rather than simply holding the parties' marriage was legally valid as a "cultural marriage," we determined their relationship should be accorded legal recognition under the putative marriage doctrine. *Id.*, ¶ 22.

evidence, beyond his own testimony, indicating that cohabitation ceremonies are a recognized part of Hmong culture. Under these circumstances, and in light of the significant testimony by Xiong and her relatives that the September 1980 ceremony was a marriage ceremony, the circuit court was not required to accept Vang's alternative characterization. "When the [circuit] court acts as the finder of fact, it is the ultimate arbiter of the credibility of the witnesses and the weight to be given to their testimony." *Plesko v. Figgie Int'l*, 190 Wis. 2d 764, 775, 528 N.W.2d 446 (Ct. App. 1994).[8]

¶ 33. Vang also asserts that, instead of accepting the testimony of Xiong and her relatives that a wedding ceremony took place, the circuit court should have given more weight to the testimony of Vang's expert witness, Yang Thai Vang. Vang emphasizes Yang Thai Vang's testimony that: (1) the clothes depicted in Exhibit 6 were not wedding clothes because they did not appear to be "new"; (2) Exhibits 6 and 40 did not depict a wedding because the marriage negotiators were not included in those photographs; and (3) the Hmong do not recognize forced marriages.

■

¶ 34. A fact finder is not required to accept an expert witness's opinion testimony. *Krueger v. Tappan Co.*, 104 Wis. 2d 199, 203, 311 N.W.2d 219 (Ct. App. 1981). Here, the circuit court specifically rejected Yang Thai Vang's testimony that the clothes shown in Ex-

---

[8] The circuit court expressly acknowledged during its oral ruling that the parties had offered "contradictory" testimony. The court therefore stated, "[M]y decision here today is based largely on my assessing the credibility of the witnesses, my watching their testimony, my assessing what they say and comparing it to what I'm reading in the documents."

hibit 6 were not wedding clothes, finding instead that those clothes qualified as wedding clothes because they were "culturally significant" for the parties. The court's finding in that regard is consistent with Xiong's testimony and is therefore not clearly erroneous. In addition, while Yang Thai Vang testified Exhibits 6 and 40 did not depict a wedding because the marriage negotiators were not included in those photographs, Xiong never claimed that those photographs depicted her wedding ceremony. Instead, she testified Exhibit 6 was taken sometime in October 1980 and Exhibit 40 was taken four days after the ceremony.

¶ 35. Moreover, although Yang Thai Vang testified the Hmong do not recognize forced marriages, Xiong's uncle testified "indirect forcing" of marriages occurs in Hmong culture. Xiong's brother similarly testified that forced marriages are accepted in Hmong culture and are "typical" in Laos. Again, the circuit court was not required to accept Yang Thai Vang's testimony, particularly in the face of countervailing evidence. *See id.*

¶ 36. The second requirement for a putative marriage is that the marriage was "celebrated in good faith by one or both parties." *Xiong*, 255 Wis. 2d 693, ¶ 22 (quoting Blakesley, *supra,* at 6). In other words, the court must find that "either or both parties believed in good faith that the marriage was valid." *Id.* The circuit court found that the "most credible testimony" in this case indicated "that both of these parties believed they were married and they were venturing forth together on this life of matrimony." This finding is supported by the documents in Exhibit 44—Xiong's United States immigration file—in which Vang represented that he was Xiong's husband. The circuit court rejected as

incredible Vang's testimony that he listed himself as Xiong's spouse on the immigration documents because he did not know what else to do. The court also noted Vang and Xiong had signed a real estate deed as "husband and wife" in 2012 and had submitted joint income tax returns as a married couple.

¶ 37. In addition, Xiong's uncle and brother both testified that Vang approached their family because he wanted to marry Xiong, and a traditional Hmong marriage ceremony took place following several days of negotiations. Xiong testified the photographs marked as Exhibits 37, 38, and 39 contained notations in Vang's handwriting indicating that they depicted "Lang and Seng's wedding." This evidence amply supports the circuit court's finding that both Vang and Xiong believed they were married following the September 24, 1980 ceremony.

¶ 38. For the reasons set forth above, the circuit court properly found that Vang and Xiong's marriage was solemnized in proper form—that is, a traditional Hmong marriage ceremony—and was celebrated in good faith by both parties. Based on these findings, the court correctly concluded the parties' relationship qualified as a putative marriage under *Xiong*. *See id.*

██

¶ 39. Vang argues the putative marriage doctrine adopted in *Xiong* is inapplicable in this case for four reasons. First, Vang contends *Xiong* is inapplicable because it was a wrongful death lawsuit, rather than a family court action. We disagree. Nothing in *Xiong* indicates that our adoption of the putative marriage doctrine in that case was limited to the context of wrongful death lawsuits. In fact, *Xiong* relied heavily on *Leong*—a case involving the division of property between putative spouses—in support of its

decision to adopt the putative marriage doctrine. *See Xiong*, 255 Wis. 2d 693, ¶ 21. Moreover, the putative marriage doctrine arose in equity, *see Leong*, 27 F.2d at 585, and divorce actions are equitable in nature, *see Caulfield v. Caulfield*, 183 Wis. 2d 83, 90, 515 N.W.2d 278 (Ct. App. 1994).

¶ 40. Vang asserts that applying the putative marriage doctrine in divorce actions will validate common-law marriages. This concern is unfounded. Prior to January 1, 1918, Wisconsin recognized common-law marriages "entered into by competent parties without witness or ceremony of any kind whereby the parties agreed to take each other for husband and wife and the agreement was consummated by cohabitation and by holding themselves out to the public as married." *Vargo v. Buban*, 68 Wis. 2d 473, 483, 228 N.W.2d 681 (1975). Unlike common-law marriages, putative marriages require that the parties solemnized their marriage in proper form, and that at least one of the parties believed they were validly married. *Xiong*, 255 Wis. 2d 693, ¶ 22. Because these distinct requirements must be fulfilled in order for a putative marriage to be recognized under Wisconsin law, applying the putative marriage doctrine in divorce cases will not, as Vang claims, validate common-law marriages in this state.

¶ 41. Second, Vang argues the *Xiong* court's ruling that a putative marriage existed depended on its finding that the parties in that case had lived for three years in Pennsylvania, which at that time recognized common-law marriage. *See id.*, ¶ 24. We do not, however, read *Xiong* as requiring residence in a common-law marriage jurisdiction in order for a relationship to qualify as a putative marriage. Although we noted in

*Xiong* that the parties' prior residence in a common-law marriage state was "another reason to recognize their marital relationship," our conclusion that a putative marriage existed was not dependent on that factor. *See id.*

¶ 42. Third, Vang argues *Xiong* is distinguishable because the parties in that case "were married in Laos, their home country, which recognizes marriages of its own citizens." Be that as it may, it was undisputed in *Xiong* that the parties' marriage was invalid under Laotian law because it was not "solemnized by the District Officer, Taseng." *See id.*, ¶ 15. If the parties' marriage in *Xiong* had been recognized under Laotian law, a putative marriage analysis would have been unnecessary. Moreover, our ultimate decision in *Xiong* that the parties had a putative marriage was in no way based on the fact that the marriage ceremony took place in their home country of Laos.

¶ 43. Fourth, Vang asserts *Xiong* is inapt because "there was no controversy about whether the parties in *Xiong* participated in a marriage ceremony," whereas the parties in this case dispute whether a marriage ceremony occurred. This argument is unavailing. Although Vang testified the ceremony at issue here was merely a cohabitation ceremony, the circuit court rejected his testimony and expressly found that a traditional Hmong marriage ceremony occurred. As discussed above, the court's finding in that regard is supported by ample evidence and is not clearly erroneous. *See supra,* ¶¶ 31–35. Nothing in *Xiong* indicates the putative marriage doctrine can only apply when both parties agree that a marriage ceremony took place.

¶ 44. For all the foregoing reasons, we conclude the circuit court properly determined that Vang and Xiong's relationship qualified as a putative marriage and should therefore be accorded recognition under Wisconsin law. We caution, however, that our decision in this case should not be read to indicate that all marriages performed according to Hmong cultural traditions, or the traditions of other cultures, are per se valid in Wisconsin. Rather, each purported marriage must be analyzed on its own facts to determine whether it qualifies as a putative marriage, based on the factors set forth in *Xiong*. *See id.*, ¶ 22.

## II. Property division and maintenance

¶ 45. Having determined that Vang and Xiong had a legally recognizable putative marriage under *Xiong*, we now turn to Vang's arguments that the circuit court erred with respect to property division and maintenance. The division of property and the determination of maintenance at divorce are entrusted to the circuit court's discretion and will not be disturbed on appeal absent an erroneous exercise of discretion. *LeMere v. LeMere*, 2003 WI 67, ¶ 13, 262 Wis. 2d 426, 663 N.W.2d 789. A court properly exercises its discretion when it examines the relevant facts, applies a proper standard of law, and uses a rational process to reach a reasonable conclusion. *Id.*

¶ 46. Our review of a circuit court's discretionary decisions may involve underlying questions of law and fact. *See Covelli v. Covelli*, 2006 WI App 121, ¶ 13, 293 Wis. 2d 707, 718 N.W.2d 260. We review any questions

of law independently, but we will not disturb the circuit court's factual findings unless they are clearly erroneous. *See id.*

## A. *Property division*

¶ 47. WISCONSIN STAT. § 767.61 governs the division of property at divorce. First, the statute provides that certain property of the divorcing parties is not subject to division—specifically, property acquired by gift, by reason of another's death, or with funds from either of those sources—unless refusal to divide the property will create a hardship on the other party or on the children of the marriage. Sec. 767.61(2). Second, the statute sets forth a presumption that all other property of the parties should be divided equally. Sec. 767.61(3). Third, the statute provides that a court may deviate from an equal division after considering thirteen enumerated factors. Sec. 767.61(3)(a)-(m).

¶ 48. The circuit court here recognized that, given the lengthy delay between the parties' separation and the filing of Xiong's divorce petition, the majority of the parties' divisible property had been dissipated or otherwise disposed of. With respect to the remaining assets, the court acknowledged the presumption of equal division set forth in WIS. STAT. § 767.61(3). After considering the factors listed in § 767.61(3)(a)-(m)., the court declined to deviate from that presumption.

¶ 49. Vang concedes on appeal that the circuit court's ruling regarding property division was largely "fair" under the circumstances. However, he asserts there is one "glaring inequity" in the court's decision. Specifically, he argues the court erred by treating as divisible property a home he purchased on Richborough Road in Green Bay in December 2008, after his

purported marriage to Patty Vang.[9] The court determined the Richborough Road residence had an equity value of $48,398 and awarded it to Vang. In order to offset that award and thereby maintain an equal property division, the court assigned Vang approximately $44,000 in student loan debt that Xiong incurred during the parties' marriage by cosigning a student loan for one of their children.[10] Vang argues this resulted in Xiong receiving a "significant windfall" because she "had absolutely nothing to do with the purchase, upkeep, or mortgage payments relative to" the Richborough Road residence, and she also "found herself clear of obligation regarding student debt[] for the education of their child."

¶ 50. Vang's main argument on appeal appears to be that the circuit court erred by concluding the Richborough Road residence was subject to division.[11]

[9] The deed in the record indicates the Richborough Road residence was purchased by "Lang C. Vang, a married individual," in December 2008. Patty Vang represented to the circuit court that she and Vang were married in 2005.

[10] The court concluded the student loan debt was a "marital debt" because it was incurred during the parties' marriage. Vang concedes on appeal that the student loan debt was "the responsibility of both parents."

[11] This is a question of law that we review independently. *See Chen v. Chen*, 142 Wis. 2d 7, 12, 416 N.W.2d 661 (Ct. App. 1987).

We observe that, in treating the Richborough Road residence as the divisible property of Vang and Xiong, the circuit court failed to account for any interest Patty Vang may have in that property. However, Vang does not develop any argument on appeal that the court erred by failing to consider Patty Vang's potential interest. The circuit court denied Patty Vang's motion to join and/or interplead, and she did not appeal from that order.

He argues the court should have concluded the parties were putatively divorced on March 15, 2005. He contends, "Upon the separation of the parties, the division of assets, and certainly the marriage of [Vang] to another woman, surely one or both of the parties truly believed that their 'marriage' had ended." Because the Richborough Road residence was acquired after the date of the parties' putative divorce, Vang argues it was not subject to division.

¶ 51. This argument fails for two reasons. First, Vang does not cite any authority—from this jurisdiction or any other—recognizing the existence of "putative divorce" as a legal concept. In fact, Vang concedes putative divorce is "not a recognized legal principle." We need not consider arguments that are unsupported by citation to legal authority. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992).

¶ 52. Second, Vang's putative divorce argument fails as a factual matter. In rejecting Vang's argument, the circuit court noted that Vang and Xiong had filed a joint income tax return for the year 2005. The court observed the "determination date" for purposes of filing a joint income tax return "is December 31st of the year of the tax return, which would indicate that when these two people signed that 2005 1040, they were representing to the United States government that on December 31 of 2005, they were husband and wife." The court also observed that, in November 2012, Vang and Xiong executed a deed "as husband and wife" transferring property to two of their adult children. Moreover, the court expressly found incredible Vang's testimony that he did not believe the parties were married. Based on these findings, the court properly

rejected Vang's argument that at least one of the parties believed their marriage had ended as of March 15, 2005.

¶ 53. To the extent Vang also intends to argue that the circuit court erroneously exercised its discretion by equally dividing the parties' property, his argument in that regard is undeveloped. Vang contends the court's treatment of the Richborough Road residence was unfair because Xiong neither paid for nor helped to maintain that property. However, Vang does not relate his argument to the factors set forth in WIS. STAT. § 767.61(3)(a)-(m)., which a court must consider before deviating from an equal property division. Although Vang argues the circuit court's property division was unfair under the circumstances, he does not develop any argument that the court's decision was based on an erroneous view of the facts or law, or that it was not the product of a rational decision-making process. *See LeMere*, 262 Wis. 2d 426, ¶ 13. We need not address undeveloped arguments. *See Pettit*, 171 Wis. 2d at 647.

¶ 54. Furthermore, Xiong argued in her respondent's brief that the circuit court properly exercised its discretion by equally dividing the marital estate based on two considerations: (1) Vang's failure to disclose significant assets on his financial disclosure statement; and (2) Vang's improper disposal of $83,000 after Xiong filed for divorce. Vang failed to file a reply brief, and, as such, he has not refuted these assertions. We therefore deem Xiong's argument that the circuit court properly exercised its discretion conceded. *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979).

*B. Maintenance*

■■

¶ 55. Vang's final argument on appeal is that the circuit court erred by awarding Xiong maintenance for an indefinite duration. Maintenance awards are governed by WIS. STAT. § 767.56, which provides that a court may grant an order at divorce "requiring maintenance payments to either party for a limited or indefinite length of time." Sec. 767.56(1c). The statute sets forth ten factors a court should consider when deciding whether to award maintenance. Sec. 767.56(1c)(a)-(j). These factors

> reflect and are designed to further two distinct but related objectives in the award of maintenance: to support the recipient spouse in accordance with the needs and earning capacities of the parties (the support objective) and to ensure a fair and equitable financial arrangement between the parties in each individual case (the fairness objective).

*LaRocque v. LaRocque*, 139 Wis. 2d 23, 33, 406 N.W.2d 736 (1987).

¶ 56. The circuit court discussed each of the factors set forth in WIS. STAT. § 767.56(1c) before awarding Xiong maintenance of $2,708.33 per month for an indefinite duration. Five of the statutory factors were particularly relevant to the court's decision. First, the court found that the parties had a long-term marriage of "almost 36 years." *See* § 767.56(1c)(a) (directing courts to consider the length of the parties' marriage when determining maintenance). The court reasoned, "[I]t's not unreasonable to start at an equal division of income when doing an analysis in a long[-]term marriage."

¶ 57. Second, the circuit court found that Xiong had no formal education and had "minimal" English language skills. *See* Wis. Stat. § 767.56(1c)(d) (directing courts to consider the educational level of each party at the time of the marriage and at the time the divorce action was commenced). The court acknowledged Xiong had experience "running the Sunrise Oriental Market," an Asian grocery store she at one point co-owned with Vang. However, the court stated it was not satisfied Xiong "gained any appreciable business acumen" through that experience that "would translate into something like getting a management position at Festival Foods." The court conceded Xiong could "probably" obtain some type of employment at an Asian market, but it stated "that's a very narrow field." On the other hand, the court found that Vang had earned a bachelor's degree during the marriage and was employed as an engineer.

¶ 58. Third, the circuit court observed that Xiong's earning capacity was "very limited." *See* Wis. Stat. § 767.56(1c)(e) (directing courts to consider the earning capacity of the party seeking maintenance). Consistent with the opinion of Xiong's vocational expert, the court found Xiong had an annual earning capacity of $15,080. In comparison, the court found that Vang had annual income of $88,757.

¶ 59. Fourth, the circuit court found that it was not feasible Xiong would, at any point, become self-supporting at a standard of living reasonably comparable to that she enjoyed during the marriage. *See* Wis. Stat. § 767.56(1c)(f). The court indicated its finding in that regard was based on Xiong's educational level, her language skills, and her age.

¶ 60. Fifth, the circuit court emphasized that Vang had earned his bachelor's degree during his

marriage to Xiong, while she "stayed home with the children, kept the house and also participated in this Oriental market." The court found that Vang "was able to progress in his career" because of Xiong's contributions, and it indicated that finding "weigh[ed] quite heavily" in its decision regarding maintenance. *See* WIS. STAT. § 767.56(1c)(i) (directing courts to consider the contribution by one party to the education, training, or increased earning power of the other).

¶ 61. Ultimately, after considering each of the statutory factors, the circuit court concluded the "fairest" course was "to equalize the [parties'] incomes." Given Vang's annual income of $88,757 and Xiong's earning capacity of $15,080, the court determined "the equalizing number on an annual basis is $32,500, which translates into $2,708.33 a month from [Vang] to [Xiong]."

¶ 62. Vang argues the circuit court erroneously exercised its discretion in three respects. First, Vang asserts the court erred by attributing to Xiong an earning capacity of only $15,080. However, in making that finding, the court relied on the report of Xiong's vocational expert, John Birder.

¶ 63. Birder noted that, during the previous fifteen years, the only work Xiong had performed outside the home was "at Sunrise Grocery[,] which was an Asian grocery store she jointly owned with [Vang]." Birder observed Xiong "was essentially the only worker" in the store, aside from her children, and her duties "consisted of managing the daily operations such as stocking merchandise, ordering merchandise (using pictures with the salesmen), cleaning the premises, checking out customers (no scanning was performed), and using the register to determine change." Birder indicated Sunrise Grocery was a "small scale

operation serving mostly the Asian population." He opined that, given Xiong's limited English language skills, it was "highly unlikely she would be able to perform similar work in the general labor market." Birder therefore concluded Xiong's future employment opportunities were limited to "unskilled manual labor." He opined that, if Xiong were to acquire employment, "she would probably earn close to the 2016 minimum wage of $7.25 per hour and $15,080 annually." In light of Birder's report, the circuit court's finding regarding Xiong's earning capacity is not clearly erroneous.

¶ 64. Vang next argues the circuit court erroneously exercised its discretion by concluding it was not feasible that Xiong would, at any point, become self-supporting at a standard of living reasonably comparable to that she enjoyed during the marriage. Once again, however, Vang's argument on this point merely asserts that the court underestimated Xiong's earning capacity. We have already concluded the court's finding regarding Xiong's earning capacity is not clearly erroneous.

¶ 65. Finally, Vang argues the circuit court erred by determining the parties were married for thirty-six years. He again asserts the court should have determined the parties were putatively divorced in 2005. We reject that argument for the reasons explained above at ¶¶ 51–52.

■

¶ 66. Vang also asserts that, "when considering the true length of the 'marriage,' one would have to consider that the parties separated in 2008, at the latest." However, the circuit court acknowledged during its oral ruling that the parties had been separated for a period of time before Xiong filed for divorce. The

court stated, "I've weighed [that factor], and it's played in my decision." Ultimately, however, the court determined after weighing all of the statutory factors that it was nevertheless appropriate to equalize the parties' income and award Xiong maintenance for an indefinite period. "[T]he weight to be given to the relevant factors under the maintenance statute is committed to the [circuit] court's discretion." *Metz v. Keener*, 215 Wis. 2d 626, 640, 573 N.W.2d 865 (Ct. App. 1997). In this case, the circuit court did not erroneously exercise its discretion by determining that other factors— particularly Xiong's limited earning capacity and her contributions to Vang's education and career— outweighed the fact that the parties were separated for several years before Xiong filed for divorce.

*By the Court.*—Judgment affirmed.