**COURT OF APPEALS
DECISION
DATED AND FILED**

**January 29, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2024AP986**

STATE OF WISCONSIN

Cir. Ct. No. 2019FA67

IN COURT OF APPEALS
DISTRICT IV

IN RE THE MARRIAGE OF:

KIMBERLEE LYNN BOROWSKI,

PETITIONER-RESPONDENT,

V.

STEVEN RAYMOND BOROWSKI,

RESPONDENT-APPELLANT.

APPEAL from an order of the circuit court for Green County: THOMAS J. VALE, Judge. *Affirmed.*

Before Blanchard, Nashold, and Taylor, JJ.

¶1 TAYLOR, J. Steven R. Borowski ("Steve") appeals the circuit court's amended order that denied his motion to terminate maintenance payments to his former spouse, Kimberlee L. Talbott ("Kim"), and restored his original

maintenance obligation as set forth in the parties' Marital Settlement Agreement (MSA). We affirm.

## BACKGROUND

¶2      Steve and Kim were married in 1996. Over the course of their marriage, they had two children, a daughter born in 2000 and a son born in 2003. Throughout the marriage and at the time of divorce, Steve was the higher income earner. In 2019, after nearly 23 years of marriage, Kim filed for divorce. At the time, Steve's annual gross income as a director of a medical clinic was approximately $139,812, and Kim's annual gross income from a part-time, retail sales position was approximately $24,048. Kim, who was represented by counsel, and Steve, who represented himself, negotiated and entered into an MSA, which resolved all issues pending in their divorce.

¶3      The MSA stated, in pertinent part, that Steve waived maintenance from Kim and that Steve would pay maintenance to Kim through January 2029 according to a maintenance schedule that reflected periodic payment increases. The MSA also stated that "[u]pon Kim remarrying or living in a marital-like relationship, it is the intention of the parties that Steve shall have motion privileges to terminate his maintenance obligation to Kim." In February 2020, the circuit court issued a Judgment of Divorce, in which it accepted and incorporated the parties' MSA.

¶4      In April 2023, Steve moved to terminate his maintenance payments, alleging that Kim had entered into a marital-like relationship by living with a romantic partner, "celebrating holidays and family events together, exchanging gifts, vacationing or dates together, and sharing household duties together." Steve also stated that he suspected that Kim was engaged or married to the partner.

¶5     In May 2023, a Family Court Commissioner ("the commissioner")[1] denied Steve's motion to terminate maintenance, concluding that Kim was not involved in a marital-like relationship ("the May 2023 order"). The commissioner reasoned that, although Kim was cohabitating with a romantic partner, cohabitation is only one factor to consider in determining whether a marital-like relationship exists for the purposes of maintenance termination, and that the evidence failed to show, in the words of the commissioner, any "significant financial ties such as joint bank accounts, whether they own real estate together or are beneficiaries of each other's wills or life insurance." Although no motion to modify maintenance was before the commissioner, the commissioner ordered that Steve's monthly maintenance obligation be reduced from $2,247.25 to $1,247.25 because Kim's recent financial disclosure statement indicated that her "financial circumstances have materially improved by approximately a net $1,000.00 per month since the time of the divorce and such improvement constitutes a substantial change in circumstances" warranting a maintenance reduction. At the time of the hearing, Steve had not produced a current financial disclosure statement. The May 2023 order also stated that any future motion for modification of maintenance would require an examination of changes to Steve's financial circumstances since the date of the divorce.

¶6     Kim moved for a de novo hearing in the circuit court for the portion of the May 2023 order that reduced Steve's maintenance obligation.[2] In early

---

[1] Pursuant to GREEN COUNTY CIRCUIT COURT RULE 401.2, family court commissioners "conduct all post-judgment hearings in any action affecting the family."

[2] "A decision of a circuit court commissioner may be reviewed pursuant to [WIS. STAT. §] 767.17 [(2023-24)]." GREEN COUNTY CIRCUIT COURT RULE 402.8. Section 767.17 requires that, upon the motion of a party, a circuit court reviews a decision by a court commissioner de novo. All references to the Wisconsin Statutes are to the 2023-24 version.

July 2023, the parties filed updated financial disclosure statements with the court and the court held a review hearing to discuss the issues to be addressed at the de novo hearing. Because no party had moved for a modification of maintenance, the court determined that the scope of the de novo hearing would be limited to Steve's motion to terminate maintenance. Based on the court's conclusion that the de novo hearing would be limited to this issue, Kim withdrew her request for a de novo hearing on the maintenance reduction issue.

¶7 In mid-July 2023, Kim moved to modify Steve's monthly maintenance payment based on Steve's increased income as indicated in his recent financial disclosure statement. Steve opposed Kim's motion and brought a second motion to terminate maintenance, again based on the argument that Kim was in a marital-like relationship.

¶8 The commissioner held a hearing on these motions and issued an order in August 2023 ("the August 2023 order"), again denying Steve's motion to terminate maintenance based on the conclusion that Kim was not in a marital-like relationship. In regard to Kim's motion to increase Steve's maintenance payments, the commissioner found that although there had been a substantial change of circumstances since the parties' divorce in that Steve had a significant increase in income, the commissioner concluded that "just because the payor has achieved a position that enables him or her to live a richer lifestyle than that enjoyed during the marriage does not mean that the payee may share this lifestyle as well through maintenance." However, the commissioner increased Steve's monthly maintenance payments back to the amount set forth in the MSA. The commissioner reasoned that, at the May 2023 hearing, the commissioner had not given "appropriate weight as to the parties' bargained-for agreement concerning maintenance," including "that the parties anticipated that the parties' incomes and

expenses would grow over time; that such changes were foreseeable to the parties; and that the parties specifically bargained for a limited term of maintenance with clear and set amounts of maintenance payments from [Steve] to [Kim] under this same set of conditions." Steve requested a de novo hearing of the August 2023 order.[3]

¶9 The circuit court held the de novo hearing in November 2023. Steve testified as follows. Since the divorce, Steve continued to live in the house he had shared with Kim and he remained employed at the clinic. His income continued to increase because he received raises at work and additional investment income from capital gains generated by the sale of stock. During the MSA negotiations, Steve had requested that the phrase "marital-like relationship" be incorporated into the MSA to avoid the situation in which an ex-spouse delays remarriage in order to continue to receive maintenance. During a phone call with Kim's attorney, which occurred amidst ongoing email discussions about maintenance and other terms of the MSA, Steve and the attorney discussed the meaning of a marital-like relationship. Steve communicated his "interpretation" of a marital-like relationship as a "[r]elationship where people are living together and going and seeing family together, spending holidays together, going on vacations, sharing different occasions that a typical married couple would do," and "see[ing] friends, go[ing] out and act[ing] as if they are married." During that phone conversation, Steve alleged that there had been no discussion that a marital-like relationship

---

[3] There was a dispute between the parties about the scope of the de novo hearing requested by Steve. Steve argued before the circuit court that he had only requested a de novo hearing on his motion to terminate maintenance, not on Kim's motion to modify maintenance. Ultimately, the circuit court considered both motions at the November 2023 de novo hearing. The court's consideration of both motions at the de novo hearing is not raised on appeal, and we do not address it further.

must involve Kim receiving a financial benefit, "financial entanglements" between Kim and the partner, or a relationship with a minimum time duration. Steve understood that a motion to terminate maintenance based on an assertion that Kim was in a marital-like relationship would be treated in the same manner as a motion to terminate maintenance upon her remarriage, and that if he claimed that she was in a marital-like relationship, the court would not need to engage in additional factfinding related to Kim receiving a financial benefit from the relationship or the length of the relationship.

¶10 During cross-examination, Steve agreed with the following. The maintenance section of the MSA, which included a detailed maintenance payment schedule, addressed Steve's financial support of Kim. Steve's predominant form of communication with Kim's attorney had been through email. Kim's attorney indicated in an email exchange with Steve that, to establish that Kim was in a marital-like relationship, Steve would have to show financial conditions and financial entanglements within the relationship, such as "joint checking accounts … joint application for loans, joint titling of items … or something like that." Steve did not communicate any objection to these financial considerations being part of the determination of whether Kim was in a marital-like relationship. Shortly after Kim's attorney set forth in the email examples of various financial considerations that the attorney said were necessary to establish a marital-like relationship, Steve signed the MSA. Steve understood that the provision that allowed him to bring a motion to terminate maintenance, if Kim purportedly entered a marital-like relationship, would not result in an automatic maintenance termination but would require him to demonstrate that Kim, in fact, was in a marital-like relationship.

¶11    Kim testified as follows.  Since the divorce, Kim had moved from her rented apartment in Monroe to an apartment in Oak Creek, which she shared with her romantic partner.  Kim left her part-time, retail job and took a full-time job as a receptionist at a healthcare clinic, increasing her income.  Kim acknowledged that the relationship with her partner was intimate and romantically exclusive.  Kim contributed to monthly joint living expenses, including the rent, utilities, groceries, and shared household chores.  Kim understood that establishing the status of a marital-like relationship under the MSA required proof that she was in a financial relationship with a romantic partner, that she and her partner shared joint assets, and that the relationship involved "financial privileges."  Kim did not share income or responsibility for debts or hold any joint assets with her partner.

¶12    The circuit court issued an oral decision denying Steve's motion to terminate maintenance, concluding that Steve failed to demonstrate that Kim was in a marital-like relationship.  The court determined that, though Kim was in an exclusive romantic, cohabitating relationship, there was no substantial financial benefit to Kim arising from the relationship because there was no evidence of any financial entanglements, such as joint finances or joint ventures, between Kim and her partner.  The court also rejected Steve's argument that because he was not required to prove that Kim benefitted financially from a remarriage, he should not be required to prove that Kim benefitted financially from a romantic relationship to establish that she was in a marital-like relationship.  The court pointed to the term "or" in the applicable provision in the MSA as establishing that remarriage and marital-like relationship are two separate and distinct types of relationships.

¶13    The circuit court also rejected Kim's motion to modify maintenance based on Steve's increased post-divorce income.  The court concluded that there had not been a substantial change of circumstances since the parties' divorce to

7

warrant an increase in maintenance from the amount set forth in the MSA. The court reasoned that it had been anticipated and reflected in the parties' maintenance agreement that the income of each party would increase post-divorce, and that the increases that came to pass did not constitute a substantial change of circumstances. The court's oral decision was incorporated into a December 2023 written order, which stated that "[a]ll other previous orders unaffected by this order remain in full effect[.]"

¶14 In January 2024, Kim requested that the circuit court clarify which "previous order" the court intended to remain in effect under its maintenance modification decision: the May 2023 order that had decreased Steve's maintenance obligation or the August 2023 order, that had returned Steve's maintenance obligation to the amount set forth in the MSA. Steve argued that the court's oral ruling and written order were consistent and effectively left in place the May 2023 order, which decreased Steve's monthly maintenance obligation.

¶15 In February 2024, the circuit court held a hearing and clarified that it intended for the August 2023 order to remain in effect. The court explained that while the parties' financial circumstances had changed, those changes did not require any modification of maintenance and that the court had "intended to have the parties bound by their original [marital settlement] agreement" as reflected in the August 2023 order. The court issued an amended written order to clarify that maintenance would be set at $2,247.25 per month effective September 1, 2023, consistent with the August 2023 order and with the terms of the MSA.

¶16 Steve appeals.

## DISCUSSION

¶17    On appeal, Steve argues that the circuit court erred in two respects: (1) by denying his motion to terminate maintenance based on the court's conclusion that Kim was not in a marital-like relationship; and (2) by amending its order to reflect the court's intent that the August 2023 order remain in effect, which sets Steve's monthly maintenance obligation to the amount stated in the MSA.  We consider, and reject, each argument in turn.

### I.  Maintenance Termination

¶18    Steve argues that the circuit court erred when it denied his motion to terminate maintenance because it improperly concluded that Kim was not in a marital-like relationship as that provision is stated in the MSA.  Specifically, Steve asserts that the court erred when it interpreted the phrase marital-like relationship to include a financial component that the parties did not intend.  Although we agree with Steve that the phrase marital-like relationship is ambiguous, we conclude that the parties intended that it would not be triggered absent proof of more than de minimus financial support provided to Kim by a romantic partner, such as through the sharing of income or holding of joint assets.  Because Steve failed to present evidence in the circuit court proceedings that Kim's relationship with the partner provided her with more than de minimus financial support, we reject Steve's argument that Kim was in a marital-like relationship and that his maintenance obligation should be terminated.[4]

---

[4] We note that in a different case, a maintenance payee's support for a romantic partner may be a valid factor to consider in determining whether a marital-like relationship exists.  Here, there was no evidence presented nor argument made that such a situation existed.  As we explain in the text, the issue of whether a marital-like relationship existed between Kim and her romantic
(continued)

## A. Standard of Review

¶19 We construe the language of a judgment of divorce, including its incorporation of an MSA, by applying the rules of contract construction, because an MSA is in the nature of a contract. *Waters v. Waters*, 2007 WI App 40, ¶6, 300 Wis. 2d 224, 730 N.W.2d 655. "When construing contracts that were freely entered into, … the best indication of the parties' intent is the language of the contract itself, for that is the language the parties 'saw fit to use.'" *Town Bank v. City Real Est. Dev., LLC*, 2010 WI 134, ¶33, 330 Wis. 2d 340, 793 N.W.2d 476 (citations omitted). "We give contract language its plain or ordinary meaning, consistent with what a reasonable person would understand the words to mean under the circumstances." *State ex rel. Massman v. City of Prescott*, 2020 WI App 3, ¶14, 390 Wis. 2d 378, 938 N.W.2d 602.

¶20 "Where the terms of a contract are clear and unambiguous, we construe the contract according to its literal terms" without resorting to extrinsic evidence. *Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶23, 326 Wis. 2d 300, 786 N.W.2d 15 (citation omitted). However, "where the language of the [contract] is subject to two or more reasonable interpretations, either on its face or as applied to the extrinsic facts to which it refers," an ambiguity exists. *Schultz v. Schultz*, 194 Wis. 2d 799, 805, 535 N.W.2d 116 (Ct. App. 1995). We interpret ambiguous terms within the context of a particular provision and with reference to the contract as a whole. *Id.* If the MSA remains ambiguous as to the meaning of contested terms after we have reviewed the context in which the terms are used

---

partner is resolved based on the absence of evidence that the partner provided more than de minimus financial support to Kim.

and the contract as a whole, we will consider the entire record in construing the terms. *Waters*, 300 Wis. 2d 224, ¶8. As with the interpretation of other contracts, the interpretation of terms in an MSA presents an issue of law that we review independently. *Id.*, ¶6. Whether a term in a contract is ambiguous is also a question of law we review independently. *Id.*

### B. The Phrase "Marital-Like Relationship" is Ambiguous.

¶21 We begin this discussion by emphasizing that we interpret the specific use of the phrase marital-like relationship at issue in this case. Parties in other cases may choose different language in their MSAs to address similar concepts, which will call for individualized analysis in the event of litigation.

¶22 The phrase marital-like relationship appears only once in the MSA, in the context of the parties' maintenance agreement, and it is not defined. Because the phrase marital-like relationship is undefined, we may consider the phrase's ordinary meaning as it might be reflected in what appear to us to be apt dictionary definitions to ascertain its meaning. *Id.*, ¶6. Here, this requires breaking down marital-like relationship into its component parts: "marital," "like," and "relationship." *See* ***State v. McKellips***, 2016 WI 51, ¶¶32-33, 369 Wis. 2d 437, 881 N.W.2d 258 (breaking down "computerized communication system" into its component parts for dictionary analysis).

¶23 We begin by examining dictionary definitions of the specific terms in marital-like relationship and then supplement those definitions with the broader understanding of the term "marriage" that we consider to be common knowledge. As will be seen, this leads to the conclusion that the words in the phrase are ambiguous as to a required element of financial support. After that, we turn to the broader context of the MSA to resolve that ambiguity. Finally, we examine the

record from the de novo hearing to further determine the parties' intent regarding the meaning of the phrase.

¶24    One reasonable dictionary definition of "marital" is "of or relating to marriage or the married state." *Marital*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/marital (last visited Jan. 15, 2026). The word "marriage" is generally defined as "the state of being united as spouses in a contractual relationship recognized by law." *Marriage*, Merriam-Webster.com, https://www.merriam-webster.com/ dictionary/marriage (last visited Jan. 15, 2026); *see also* WIS. STAT. § 765.01 ("Marriage, so far as its validity at law is concerned, is a civil contract, to which the consent of the parties capable in law of contracting is essential, and which creates the legal status of husband and wife."). One reasonable dictionary definition of "like" is "the same or nearly the same (as in appearance, character, or quantity)." *Like*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/like (last visited Jan. 15, 2026). "Relationship" is reasonably defined as including "a romantic or sexual friendship." *Relationship*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/relationship (last visited Jan. 15, 2026).

¶25    Pulling together these apt definitions of each word to define the phrase as a whole, we conclude that the elements of a marital-like relationship as defined in the MSA here include a relationship that is: romantic or sexual in nature; lacking legal recognition by the state; and more than a casual dating relationship because it mimics the attendant contractual rights and responsibilities of a legal marriage. Based solely on these dictionary definitions, the phrase might be deemed unambiguous in failing to include an explicit requirement of financial support. But it is necessary to supplement these definitions due to the widely recognized common attributes associated with marriage, including a set of ethnic,

12

religious, and cultural traditions. *See, i.e.*, **Xiong v. Xiong**, 2002 WI App 110, 255 Wis. 2d 693, 648 N.W.2d 900 (accepting evidence regarding traditional Hmong ceremonial rites performed in Laos twenty-three years earlier as establishing the existence of a marriage that entitled the husband, rather than the couple's children, to bring a wrongful death claim regarding his deceased wife).

¶26    Using this broader frame of reference about conduct that resembles or constitutes typical marriages, for example, a continuous romantic relationship between two, unmarried individuals could be considered marital-like when they engage in activities such as: parenting children they share; cohabitating and sharing living expenses but otherwise maintaining separate finances; or sharing all financial rights and responsibilities and residing together or apart. There are other reasonable combinations of elements of a continuous, romantic relationship that involve financial support that could establish that individuals are in a marital-like relationship. The key point for purposes of this appeal, however, is that one reasonable interpretation of the phrase is that it requires proof of at least some degree of financial support. Accordingly, we conclude that the phrase marital-like relationship is ambiguous because it is reasonably susceptible to two or more meanings, including one without the requirement of financial support and one with the requirement.

¶27    Given this ambiguity, we examine the entirety of the MSA for contextual help in ascertaining the parties' intended meaning of the phrase. The MSA, in pertinent part, states as follows:

IV.    MAINTENANCE

A.    Steve waives the right to claim or receive maintenance from Kim. The Court's jurisdiction to award maintenance from

> Kim to Steve shall terminate upon the granting of a final Judgment of Divorce.

> B.   Kim shall receive maintenance from Steve as follows:

>> 1.   From the final date of divorce until [the son] graduates from high school, Steve shall pay to Kim in the amount of $1,187.00 per month.

>> 2.   Upon [the son] graduating from high school, Steve shall then pay to Kim in the amount of $2,247.25 per month until either [the son] turns 23 years old or [he] becomes self-insured, whichever comes earlier.

>> 3.   Upon [the son] turning 23 years old or becom[ing] self-insured, whichever comes earlier, Steve shall then pay to Kim in the amount of $2,313.00 per month through January 2029.

>> ….

> C.   Upon Kim remarrying or living in a *marital-like relationship*, it is the intention of the parties that Steve shall have motion privileges to terminate his maintenance obligation to Kim.

(Emphasis added.)  As noted, the phrase appears only in this section of the MSA.

¶28   In addition to outlining a schedule for the amount of maintenance payments that Steve must make to Kim, the maintenance section of the MSA sheds relevant light on the parties' intended meaning of "marital-like relationship," leading us to the following conclusions.  First, we conclude that a marital-like relationship is not shown merely from Kim and a romantic partner cohabitating, although cohabitation can certainly be a relevant consideration.  If the parties intended for Kim's cohabitation with a romantic partner alone to satisfy the marital-like relationship requirement, the agreement would have used a more limited and specific phrase such as "romantic cohabitation" and not the broader phrase, marital-like relationship.  Further, we conclude that proof of romantic cohabitation without financial support would not be sufficient.  Steve's limited-

14

term maintenance obligation to Kim and the payment schedule set forth in the MSA is in the context of a detailed financial agreement. This agreement governs the parties' post-judgment obligations and commitments following the dissolution of the parties' long-term marriage and the significant income disparity between them. It is reasonable to infer that the parties intended that Kim's involvement in a continuous, romantic relationship could provide a basis for maintenance termination if such a relationship provided more than de minimus financial support for Kim that rendered Steve's maintenance payments unnecessary. This interpretation is consistent with the support and fairness objectives of maintenance: to provide support for a recipient spouse so that the spouse maintains the lifestyle previously enjoyed jointly by the parties and to ensure a fair and equitable financial arrangement between the parties. *See LaRocque v. LaRocque*, 139 Wis. 2d 23, 33, 406 N.W.2d 736 (1987). We infer, given their detailed financial arrangements and specific maintenance provisions, that the parties incorporated the dual support objectives of maintenance into the MSA. Hence, our examination of the entirety of the MSA leads us to conclude that, under the marital-like relationship provision, Steve is entitled to maintenance termination if he is able to show that a romantic partner provides Kim with more than de minimus financial support.

¶29    In sum on this issue, our consideration of dictionary definitions of the individual words included in the phrase marital-like relationship and a broader consideration of the meaning of "marriage," together with an examination of the MSA, leads to the conclusion that the parties intended that a marital-like relationship be triggered by proof of a continuous, romantic relationship that provides more than de minimus financial support for Kim.

¶30    Having derived a definition of the phrase from the sources indicated, we may also consider the record as a whole, as allowed by *Waters*, 300 Wis. 2d 224, ¶8, in an attempt to gain further clarity of the parties' intended meaning of the phrase, given that it is ambiguous when considered in isolation.  The evidence introduced at the de novo hearing provides further examples of the parties' intended meaning of the phrase.

### C.  Financial Support Through Shared Income or Assets

¶31    Based on the evidence introduced at the de novo hearing before the circuit court, we conclude that the parties' intended the phrase marital-like relationship to include, as one requisite condition, more than de minimus financial support provided to Kim, such as in the form of shared income or joint assets.

¶32    As noted, there was a series of emails between Steve and Kim's attorney, which were introduced during the de novo hearing, that detailed the MSA negotiations regarding maintenance and other terms.  These emails support our conclusion.

¶33    To begin, Steve requested the inclusion of "standard legal language to indicate that maintenance would terminate if Kim remarries or enters into a marital-like relationship."  Kim's attorney responded to Steve's request, in pertinent part, by stating, "I'll check with Kim.  Just to be clear … the only automatic termination of maintenance is upon death.  Even including this language still requires a motion."  Several days later, the attorney stated in an email to Steve: "I believe as a condition to ending this quickly, I can get my client to agree to language that upon remarriage or assuming a marital-like relationship, you will have motion privileges to terminate maintenance."  Steve and the attorney

exchanged several more emails and had a phone conversation about the maintenance terms.

¶34    Eventually, Kim's attorney forwarded to Steve a draft MSA, which contained similar language to that reflected in section IV.C.  Steve then requested an addition that Kim would not contest a motion to terminate maintenance.  Kim's attorney responded as follows:

> By law, Kim can't do this, even if she agreed to it (and she doesn't and I wouldn't advise her).  This actually reaches into constitutional law and civil liberties.
>
> However, I see the concern in your request.  Here is how it would work in real life- married or otherwise: Kim would have to be living with someone for a sustained (i.e. +2 years at minimum) period, they would have to have joint accounts (checking or whatever), and it would have to be shown that they have held themselves out as married (i.e. joint application for loans, joint titling of items, some kind of dedicated website to the "Kim and [guy] Show" or something like that.[)]  If that happens, your motion privileges are solid.  I've said this before to you.
>
> I'm happy to keep the language concerning the marital-like relationship.

¶35    Several more emails were exchanged on the matter, with the attorney eventually responding that "I would never advise any client to waive any future right to contest a matter.  I won't be changing that approach in this case."  Although email communications continued between Steve and Kim's attorney regarding maintenance terms, Steve never: disputed the attorney's explanation about what proof of a marital-like relationship would be required; offered a countervailing understanding of a marital-like relationship; or indicated that he rejected any aspect of the attorney's examples of required conditions.  Eventually, Steve dropped his request that Kim agree not to contest a motion to terminate maintenance, and the MSA was signed without including such a waiver.

¶36   Steve's testimony during the de novo hearing also supports our conclusion about the parties' intended meaning of the phrase marital-like relationship.  Steve conceded that the phrase marital-like relationship was about finances and financial support and that he did not object to the attorney's examples of what would constitute a "marital-like relationship," including the sharing of income through joint bank accounts or the joint titling of assets.  Steve conceded that he understood that the maintenance section was about providing financial support to Kim, and that he understood and agreed to the terms of the MSA before signing it.

¶37   Kim's testimony also supports our conclusion that the parties intended the phrase marital-like relationship to include financial support provided by the romantic partner to Kim, such as through shared income or joint assets.  Kim testified that her understanding of the MSA was that Steve could bring a motion to terminate maintenance if she were in a "financial relationship with someone else."  Because Steve did not object to the description of a marital-like relationship provided to Steve by Kim's attorney, and Steve did not propose additions or clarifications to the factual circumstances that the attorney outlined regarding aspects of a marital-like relationship, Kim assumed that Steve had agreed with the conditions that he would need to prove for his maintenance obligation to terminate based on Kim being in a marital-like relationship.

¶38   Steve argues that, had the parties intended to include proof of financial support to Kim by a romantic partner, the MSA would have explicitly stated this.  We reject this argument for reasons that we have already explained, including the fact that the MSA did not define the phrase marital-like relationship at all.  Accordingly, there was no definition of a "marital-like relationship" that

omitted reference to required financial support to Kim by a romantic partner because there was no definition of the phrase in the agreement whatsoever.

¶39    Steve argues that to require proof that a romantic partner provides financial support to Kim renders the marital-like relationship provision meaningless.  For example, Steve argues that he gains no new benefit from the MSA because he already had the right to bring a motion to modify or terminate maintenance based on Kim's romantic cohabitation or remarriage.  Therefore, he argues, to interpret the phrase marital-like relationship to include financial support for Kim results in Steve having "less benefit[s] under the parties' [MSA] than he does statutorily or under the common law."  We reject this argument on several grounds.

¶40    First, the parties' maintenance agreement as set forth in the MSA neither addresses nor restricts Steve's ability to bring a motion to modify maintenance based on a substantial change in circumstances.  The romantic cohabitation of a payee is one factor that a court may consider in determining whether a substantial change in circumstances warrants a maintenance modification. *See Woodard v. Woodard*, 2005 WI App 65, ¶10, 281 Wis. 2d 217, 696 N.W.2d 221 ("In the maintenance modification context, it is well established that courts, in determining whether to modify maintenance, must consider the effects of a recipient's cohabitation arrangement on the recipient's financial condition."); *see also Rohde-Giovanni v. Baumgart*, 2004 WI 27, ¶30, 269 Wis. 2d 598, 676 N.W.2d 452 ("In order to modify a maintenance award, the party seeking modification must demonstrate that there has been a substantial change in circumstances warranting the proposed modification.").  Steve did not bring a motion to modify maintenance before the commissioner or the circuit court, but only a motion to terminate maintenance.  Nor did Steve move to terminate

maintenance on any basis other than on the phrase marital-like relationship as stated in the MSA. Hence, Steve fails to show that interpreting the marital-like relationship provision in the MSA as requiring more than de minimus support for Kim from a romantic partner affords him fewer statutory or common law rights, rendering the maintenance terms in the MSA meaningless. We recognize that what constitutes sufficient financial support for the termination of maintenance as provided in a contract with a like phrase will depend upon the specific terms of the contract. We also recognize that the degree of financial support that a maintenance payee receives from a romantic partner, which may constitute a substantial change of circumstances warranting maintenance modification or termination, is based on specific factual determinations to be made by the circuit court. *See Rohde-Giovanni*, 269 Wis. 2d 598, ¶34 ("the modification judge will need to consider additional facts that were not before the original divorce court because of the substantial changes that have occurred").

¶41 Second, we reject Steve's argument that the MSA grants him no more benefit to terminate maintenance than provided under statute or common law. The maintenance termination section of the MSA grants Steve a broader contractual right to terminate maintenance. Both parties interpret "marital-like relationship" as not only allowing Steve to bring a motion to terminate maintenance based on Kim's alleged involvement in a marital-like relationship, but also allowing the circuit court to terminate maintenance if it makes such a determination. There is no such specific provision in statute or in common law. Indeed, Steve conceded during his de novo hearing testimony that a court could not order, as part of a divorce judgment, that a payor's maintenance obligation terminate upon the payee entering into a marital-like relationship in the absence of the parties' explicit agreement on that point. And although there is case law

providing that a court may terminate maintenance when it is demonstrated that a payee has benefitted from circumstances similar to those that can be created in a marital-like relationship, including by receiving financial support, the termination decision in those cases was based on finding a substantial change of circumstances. *See* WIS. STAT. § 767.59(1c)(a)1.; ***Van Gorder v. Van Gorder***, 110 Wis. 2d 188, 197, 327 N.W.2d 674 (1983) ("where the cohabitation does enhance the recipient's financial condition, payments that are no longer needed for support should not have to be made"); *see also* ***Rohde-Giovanni***, 269 Wis. 2d 598, ¶47 (affirming that the circuit court had sufficient evidence to reasonably find a substantial change in the parties' circumstances that justified the termination of maintenance); ***Taake v. Taake***, 70 Wis. 2d 115, 122, 233 N.W.2d 449 (1975) (holding continuous cohabitation with arrangements for joint support constituted substantial change of circumstances warranting a maintenance modification). No similar conclusion need be made here if a court determines that Kim is in a marital-like relationship. By including a marital-like relationship condition in the MSA as a basis for terminating maintenance, the parties agreed to an alternative ground for terminating maintenance that is not specifically provided for in Wisconsin statutes or case law. *See* ***Rintelman v. Rintelman***, 118 Wis. 2d 587, 596-98, 348 N.W.2d 498 (1984) (Courts will enforce the terms of the parties' contractual agreement in a divorce when enforcing a maintenance obligation even where the terms could not have been imposed independently by the court through statute.).

¶42 Steve also argues that Kim's remarriage or her participation in a marital-like relationship should be treated the same way by the circuit court. In other words, because Steve does not have to prove that a remarriage results in financial support to Kim, he should not have to prove that Kim receives financial

21

support from a marital-like relationship. We reject this argument. Even though "remarriage" and a "marital-like relationship" each trigger Steve's ability to bring a motion to terminate maintenance, and, if found, result in Steve's maintenance obligation terminating, the construction of the sentence with the conjunction "or" indicates that a marital-like relationship is distinct from a remarriage. Upon a payee's remarriage, a payor wishing to terminate maintenance must still bring a motion to terminate maintenance with notice to the payee and with proof that a marriage has occurred. WIS. STAT. § 767.59(3). Likewise, Steve would need to bring a motion to terminate maintenance based on Kim's involvement in a marital-like relationship, and he would be required to demonstrate to the circuit court that such a relationship exists in order for his maintenance to terminate under this provision.

¶43　The differences here between the term "remarriage" and "marital-like relationship" as that phrase is used in the MSA, is that proof of a remarriage is simpler. In contrast, as discussed, proof of a marital-like relationship would require various types of evidence, some of which might take effort to discover and present to the court. Further, as we have discussed, we conclude that the parties here intended that a marital-like relationship would include more than de minimus financial support for Kim, such as through shared income or jointly titled assets. Therefore, we reject Steve's argument that he should not have to prove that Kim is receiving financial support in a marital-like relationship.

¶44　Steve also asserts that because at least some marriages do not include any or much in the way of financial support or entanglements, we should not require proof of such an arrangement here. It is true, as noted, that marriages may include many different expectations and arrangements. But we have explained how the record here reveals that the parties intended a marital-like

22

relationship to include more than de minimus financial support for Kim, such as through shared income or joint assets. Steve may also intend to argue that we should not consider a marital-like relationship to include financial support for Kim because some maintenance payees will structure romantic relationships to avoid maintenance termination. *See Van Gorder*, 110 Wis. 2d at 197 ("cohabitors should not be able to fashion their relationship and finances in a manner that is intended solely to prevent the modification of maintenance payments"). We reject this argument for at least the reason that Steve has not developed any argument before the circuit court or now on appeal that Kim structured her relationship and living circumstances for this purpose. *See Associates Fin. Servs. Co. of Wis., Inc. v. Brown*, 2002 WI App 300, ¶4 n.3, 258 Wis. 2d 915, 656 N.W.2d 56 (the court may decline to consider conclusory or undeveloped arguments that are not adequately briefed).

¶45 Steve also argues that the circuit court incorrectly treated Steve's motion to terminate maintenance as a common law cohabitation motion under *Van Gorder* rather than as a motion to enforce the parties' contract. *See Van Gorder*, 110 Wis. 2d at 197 (holding that terminating maintenance based solely on cohabitation constitutes reversible error). We reject this argument for at least two reasons. First, we independently determine the meaning of the terms of a contract and are not bound by the circuit court's conclusion. *Manitowoc Co., Inc. v. Lanning*, 2018 WI 6, ¶21, 379 Wis. 2d 189, 906 N.W.2d 130. Second, Steve cites no legal authority to support the proposition that courts are precluded from considering how similar terms have been interpreted in case law concerning maintenance termination. Indeed, our supreme court in *Van Gorder* concluded that, in determining whether a substantial change in circumstances warrants maintenance termination when a payee is cohabitating with a romantic partner,

courts must also consider the degree of financial dependence between the payee and the partner. *Van Gorder*, 110 Wis. 2d at 197. Our definition and application of the marital-like relationship provision here is not only consistent with the intent of the parties, but also consistent with case law.

¶46 We also reject Steve's argument that the circuit court erred in failing to construe the maintenance section of the MSA against Kim's attorney as the drafter. Generally, ambiguous contracts are construed against the drafter when there is clear proof of the drafting party. *See, e.g.*, **Wisconsin Label Corp. v. Northbrook Prop. & Cas. Ins. Co.**, 2000 WI 26, ¶24, 233 Wis. 2d 314, 607 N.W.2d 276 (ambiguities in contracts are interpreted against the drafter, especially when the contract is a standard form supplied by the drafting party); **Buccholz v. Schmidt**, 2024 WI App 47, ¶24, 413 Wis. 2d 308, 11 N.W.3d 212 ("If a contract provision is ambiguous, we will construe the provision against the drafting party if there is a clear drafting party."). However, we construe an ambiguous contract against the drafter only if the extrinsic evidence is insufficient to resolve the ambiguity. **Ash Park, LLC v. Alexander & Bishop, Ltd.**, 2015 WI 65, ¶36, 363 Wis. 2d 699, 866 N.W.2d 679; *see also* WIS JI—CIVIL 3051, Contracts: Ambiguous Language (Construing ambiguous language against the drafter is the final result if the language remains ambiguous.). Here, as explained, we resolve the ambiguity of the marital-like relationship phrase by considering not only the language of the phrase and the MSA as a whole, but also by considering the de novo hearing record. Second, construing the phrase marital-like relationship against Kim's attorney would be unreasonable when it was Steve who proposed the inclusion of this phrase in the MSA. *See* **Maryland Arms Ltd P'ship**, 326 Wis. 2d 300, ¶44 (construing ambiguous language against the drafter "operates

against the party who supplie[d] the words" (citing RESTATEMENT (SECOND) OF CONTRACTS § 206 (1979))).

¶47     In sum on this issue, we conclude that the record as a whole establishes that the parties intended the marital-like relationship provision to require proof that Kim receive more than de minimus financial support, such as in the form of shared income or joint assets, from her romantic partner.  For the reasons discussed, we reject Steve's arguments otherwise.[5]

### D.  The Circuit Court Did Not Err.

¶48     Having determined that the phrase marital-like relationship in the MSA requires proof of a continuous romantic relationship in which Kim receives more than de minimus financial support, such as through shared income or joint assets, we conclude that Steve has failed to demonstrate that Kim was in a marital-like relationship.

¶49     We examine the circuit court's factual findings for clear error, but independently apply the facts in determining whether Steve has demonstrated a marital-like relationship.  *Rohde-Giovanni v. Baumgart*, 2003 WI App 136, ¶5, 266 Wis. 2d 339, 667 N.W.2d 718 (quoting *Benn v. Benn*, 230 Wis. 2d 301, 307,

---

[5] Kim's response brief cites a per curiam opinion of this court for "exemplary purposes" on this issue.  Per curiam opinions may not be cited in any court of this state as precedent or for persuasive authority except for the limited purposes specified in WIS. STAT. RULE 809.23(3), which are not applicable here.  We remind Kim's counsel that per curiam decisions may not be relied on for even "exemplary purposes" and such reliance may subject attorneys to financial penalties, particularly for repeated violations.  *See Tamminen v. Aetna Cas. & Sur. Co.*, 109 Wis. 2d 536, 563-64, 327 N.W.2d 55 (1982) (imposing $50 penalty pursuant to WIS. STAT. RULE 809.83(2) against petitioner's attorneys for violating RULE 809.23(3)); *see State v. Milanes*, 2006 WI App 259, ¶21, 297 Wis. 2d 684, 727 N.W.2d 94 (imposing $50 penalty on defendant's appellate counsel for violating RULE 809.23(3)).  We refrain from imposing a financial penalty here.

602 N.W.2d 65 (Ct. App. 1999) ("A circuit court's findings of fact regarding what changes have occurred in the circumstances of two parties will not be disturbed unless they are clearly erroneous. However, the question of whether those changes are substantial is a question of law which we review *de novo.*")).

¶50     After a day-long evidentiary hearing, the circuit court determined that Steve offered no evidence to refute Kim's testimony that she and her romantic partner do not jointly own or jointly hold title to any assets or share income through joint financial accounts, such as joint bank accounts. The court found that the slight change to Kim's expenses from cohabitating did not change her "relative position" since the divorce and that such changes to the parties' circumstances were anticipated by the MSA. The court acknowledged that "you can assume there is some financial benefit from sharing a household, but the testimony here is clear, and that's not been disputed, that [Kim] said we keep separate finances. We don't own anything together. Yeah, we buy things or go out to eat together," but these facts serve only to establish a romantic relationship, not a marital-like relationship. In sum, the court found no evidence of what the court termed "substantial financial benefit" to Kim from her partner.

¶51     Steve argues that Kim incurred a substantial financial benefit in her relationship by obtaining a full-time job in a community with higher wages when she moved to cohabitate with her romantic partner, and by sharing utility bills and transportation costs with her partner. However, the fact that Kim's wages increased is not the result of her being in a relationship with her partner but because she obtained a new, full-time job that paid higher wages. To the extent that Kim received financial support from her relationship by cohabitating, the court found that it was of negligible benefit. We agree. Kim's undisputed testimony supports a conclusion that the financial relationship with her partner

26

was more akin to roommates sharing common living expenses than to a marital-like relationship which provided more than de minimus financial support to Kim.

¶52    When applying these facts to our definition of "marital-like relationship," we conclude that Steve has not demonstrated that Kim was in a marital-like relationship because he failed to prove that Kim received more than de minimus financial support, such as in the form of shared income or joint assets. Accordingly, like the circuit court, we reject Steve's maintenance termination claim.

## II.  Maintenance Modification

¶53    Steve argues that the circuit court erred when it amended its December 2023 order to clarify that it intended that the August 2023 order, which restored Steve's monthly maintenance payments to the amount set forth in the MSA, remain in effect.  We conclude that the court did not err in clarifying its intent through an amended order.

¶54    It is clear from the transcript of the de novo hearing that the circuit court concluded that no substantial change of circumstances since the parties' divorce had been demonstrated to warrant a modification of Steve's maintenance obligation as set forth in the MSA, which was consistent with the findings of the commissioner and the August 2023 order.  We conclude that by amending the written order of its decision, the court was merely adding language to clarify its intent that the August 2023 order, which restored Steve's maintenance obligation to the amount set forth in the MSA, remain in effect.

¶55    Steve fails to recognize that a circuit court has inherent authority to modify its orders.  *Cashin v. Cashin*, 2004 WI App 92, ¶10, 273 Wis. 2d 754, 681

27

N.W.2d 255; *see also* WIS. STAT. § 767.01(1) ("circuit courts have jurisdiction of all actions affecting the family and have authority to do all acts and things necessary and proper in those actions and to carry their orders and judgments into execution as prescribed by this chapter"). Here, the circuit court did not err by issuing an amended order to clarify that it found no substantial change in circumstances to warrant a modification of Steve's maintenance obligation as set forth in the MSA, and that the August 2023 order remains in effect.

## CONCLUSION

¶56    For the reasons set forth above, the circuit court's amended order denying Steve's motion to terminate maintenance and restoring Steve's original maintenance obligation as set forth in the MSA and in the August 2023 order, is affirmed.

*By the Court.*—Order affirmed.

Recommended for publication in the official reports.